### WILKS v. UNITED STATES.

No. 391.

Circuit Court of Appeals, Second Circuit.

June 27, 1933.

George Z. Medalie, U. S. Atty., of New York City (George B. Schoonmaker, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Abraham J. Rosenblum, of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This suit was commenced in May, 1929, to recover upon a policy of war risk insurance issued to the plaintiff during his enlistment in the United States Army. He enlisted in September, 1918, served in the Field Artillery at Camp Zachary Taylor, Ky., and was honorably discharged in January, 1919. He allowed his insurance to lapse with his discharge, but he contends that he became totally and permanently disabled while the policy was still in force. This the defendant denied. The issue was submitted to a jury which, after twice reporting that it was unable to agree, finally brought in a verdict for the plaintiff. At the conclusion of the evidence the defendant moved for a directed verdict, and the principal question presented by this appeal is whether that motion should have been granted.

There is evidence from which the jury might well have found that, when the plain-

tiff left the army, he had the dread disease known as multiple sclerosis. This disease first attacks the lower part of the spinal cord and ultimately invades the brain. It is usually of very slow development, but is always progressive and always incurable. It manifests itself in an impairment of control of the leg muscles, at first shown only by a slight stiffness of gait, and gradually progresses until its unfortunate victim loses all use of his legs, then of his hands, and finally the brain itself becomes involved. Dr. Hammond, a well-known neurologist, first examined the plaintiff in May, 1920. He testified that he then diagnosed the case as multiple sclerosis and that he could say with reasonable certainty that it had been present from nine months to a year. Dr. McKendree, another neurological specialist, saw the plaintiff in the autumn of 1925. He was then "practically incapacitated." Answering a hypothetical question based on the testimony of the plaintiff's father that within a week after his discharge from service his son had complained of inability to use his legs and had stopped to rest in the course of a short walk, the doctor expressed the opinion that the disease was in existence at that time. Both doctors testified that the disease sometimes follows, and is thought to be caused by, some infectious disease, such as influenza. The plaintiff had had an attack of influenza at Camp Zachary Taylor in November, 1918, which confined him to quarters for three days, during which he had a fever. It is possible that this caused the multiple sclerosis with which he was later afflicted, but whether or not his disease was connected with his army service is wholly immaterial to recovery upon his policy of insurance.

■ To establish his right to recover, he must prove that he was totally and permanently disabled while his policy was in force. Granted that when discharged from the army he had a disease which was certain to incapacitate him in the future, partially at first and totally in time, such proof is insufficient. A condition of both total and permanent disability must exist before his policy lapsed. Eggen v. United States, 58 F.(2d) 616, 618 (C. C. A. 8); Nicolay v. United States, 51 F.(2d) 170, 172 (C. C. A. 10); United States v. McGrory, 63 F.(2d) 697, 698 (C. C. A. 1); United States v. Lumbra, 63 F.(2d) 796, 797 (C. C. A. 2). The matter chiefly in dispute is whether there was evidence from which the jury could properly find that the plaintiff was totally disabled in January, 1919. For the sixteen days immediately preceding his discharge he took part in target practice with his battery and was able to perform in his turn each assignment from gunner to battery commander, experiencing no trouble of any kind. His enlistment record reports his physical condition as good at the time of his discharge. He then returned to Columbia University to resume a course of premedical studies. He apparently continued his studies for about a year and then withdrew. He testified that he was unable to keep up with his studies because he had difficulty with his legs. He "could stand on them but could not get around." For a year and a half, from July, 1920, to January 31, 1922, he worked as a bookkeeper at the Chelsea Exchange Bank, receiving a salary of $75 per month. The testimony shows that, without detriment to his health, he was able to do work of this character, which permitted him to be seated most of the day. When Dr. Hammond first saw him in May, 1920, he was able to walk without using a cane, and the tremor in his right hand did not develop until more than a year thereafter. The plaintiff testified that after withdrawing from Columbia University he took an examination to teach music and held a position as a high school music teacher for a couple of years. The record does not clearly disclose the years during which he was able to do this work. He said he stopped teaching about 1925 or 1926; but probably he was confused as to the dates. He was "practically incapacitated" when Dr. McKendree saw him in 1925, and the defendant conceded that for purposes of awarding compensation he was considered totally disabled from 1924 on.

■ Upon this record we do not think the jury can be permitted to find that he was totally disabled in January, 1919. The regulations have defined total disability as "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation." By "continuously" is meant with reasonable regularity. While the difficulty with his legs developed shortly after his discharge, he was not obliged to use a cane until more than a year later, and he was able to work as a bookkeeper at least until January, 31, 1922. So far as appears, he lost no time whatever; that is, he pursued this work with reasonable regularity. Such work was not dangerous to his health and did not accelerate the progress of the disease. During this same period, or later, he also held a position as a high school music teacher. The gallant effort of this young man to continue as long

as possible in remunerative employment must necessarily stir one's admiration and sympathy, but it cannot be allowed to blind us to the conclusion that during this period he was not totally disabled. He was but partially and permanently disabled, even though total permanent disability was certain to come thereafter. He did not prove that the contingency insured against occurred while the policy was in force. Consequently the defendant's motion for a directed verdict should have been granted. See Gregory v. United States, 62 F.(2d) 345 (C. C. A. 4); United States v. Diehl, 62 F.(2d) 343 (C. C. A. 4); United States v. Seattle Trust Co., 53 F.(2d) 435 (C. C. A. 9); United States v. McLaughlin, 53 F.(2d) 450 (C. C. A. 8); and cases supra.

The other errors assigned by the appellant may be disposed of very briefly. Complaint is made that the plaintiff's father was allowed to recite certain statements made by the plaintiff in the course of a short walk during which he stopped and leaned against a gate for support. They were challenged as hearsay. Some of the statements represented spontaneous expressions of mental or physical condition accompanying the occurrence, and so were within a recognized exception to the hearsay rule. See Proechel v. United States, 59 F.(2d) 648, 650 (C. C. A. 8); United States v. O'Brien, 51 F.(2d) 37, 41 (C. C. A. 4); Wigmore, Evidence (2d Ed.) §§ 1714–18. One or two appear to be narrative responses to the father's questions. They might better have been excluded, but they added so little to the spontaneous exclamations that no prejudicial error is apparent. Nor do we see anything seriously prejudicial in the form of the charge respecting preponderance of the evidence and the finding of a verdict for the plaintiff even though the jury entertained considerable doubt. But for the error first discussed the judgment must be reversed and the cause remanded for a new trial.