**TARTER v. UNITED STATES.**

No. 1561.

District Court, W. D. Kentucky, at Louisville.

Jan. 14, 1937.

Trabue, Doolan, Helm & Helm, of Louisville, Ky., and Oliver Popplewell, of Liberty, Ky., for plaintiff.

Bunk Gardner, U. S. Atty., and Oldham Clarke, Asst. U. S. Atty., both of Louisville, Ky.

HAMILTON, District Judge.

This case is pending before me on motion for new trial filed by the defendant, in support of which two grounds are urged:

First, it is argued with great zeal by counsel for the defendant that a directed verdict was proper; and, second, the court's instructions were erroneous. A determination of the first ground requires a statement of the ultimate facts.

The plaintiff on May 3, 1913, at the age of 27, entered the Army of the United States as a private at Fort Logan, Colo. On April 28, 1919, he was discharged at Camp Taylor, Ky. He was a member of the American Expeditionary Forces in France from September 7, 1917, to September 29, 1918. On July 1, 1918, at Vaux, France, he suffered a gunshot wound in the right arm at the elbow joint and remained in a base hospital at that place for two months. The wound caused a complete ankylosis of the right elbow joint, with three long, ugly scars radiating therefrom, a joint deformity of the ulna and radius of the elbow.

The plaintiff was in good health and had no disability when inducted into the service. In 1914 he had an attack of measles and mumps, and in 1916 pleurisy and pneumonia. At the time of his discharge, April 28, 1919, with a surgeon's certificate of disability, the physical examination showed he was suffering from chronic pharyngitis and rhinitis and diminished resonance in both lungs; distant broncho-vesicular breathing. The X-ray examination showed peribronchial shadows enlarged and fused, with fibrous extensions into both lungs, especially the right, pleural adhesions at base of the right lung, large globular heart displacement to the left. The physical examination also showed he was fairly well developed and nourished.

The plaintiff was examined August 14, 1919, after his discharge from the Army (April 28, 1919), which examination showed rales in the upper lobe of the left lung. Subsequent examinations showed chronic pharyngitis and rhinitis, and on an examination December 18, 1919, by Dr. G. M. Carput of the Public Health Service Hospital, Greenville, S. C., the diagnosis was "chronic pulmonary tuberculosis, moderately advanced quiescent." On March 8, 1920, Dr. C. B. Neidhamer, Lexington, Ky., on an examination of the plaintiff, in his diagnosis said, "From standpoint of lungs— negative. * * * It is my opinion he has not tuberculosis."

Plaintiff had thirty-three examinations after his discharge from the Army, the first on August 14, 1919, and the last one Au-

gust 29, 1932. Nine of the examinations showed in the diagnosis tuberculosis; six, chronic bronchitis; most of them showed rales were heard in both lungs; one or two showed pleurisy. Dr. J. C. Lewis, who examined plaintiff August 8, 1925, found no evidence of pulmonary tuberculosis. Two examinations showed chronic pharyngitis. None of the examinations showed a normal condition of the lungs or respiratory system.

Plaintiff testified he had pneumonia before going overseas; that he was in active service and served at Chateau Thierry and Vaux, France, in Belleau Woods. He was a sergeant, and his duties were to test for gas, without his mask on, and he was exposed to gas several times while in action, at which times he spit blood for several days. He was constantly in the front line trenches for 17 days, and received the wound in the arm by a machine gun while attempting to rescue his captain under heavy firing during an attack, after which he did not return to his company, but remained in army hospitals for eleven months, three months in France, and was discharged on account of disability April 29, 1919. He said he had been able to do but little work, and soon after returning home was bedfast for three months, and that Dr. O. P. Miller of the Veterans' Bureau advised him he had tuberculosis. He said he spent some time in a government hospital in Greenville, S. C., and was home for a short time, and was ordered back to Somerset, Ky., to the government hospital which handled tuberculosis cases exclusively; that he was again in government hospitals at Greenville, S. C., Dawson Springs, Ky., and at the Marine Hospital, Louisville, Ky., three times; and that he applied for government vocational training but the doctor at the Marine Hospital, Louisville, Ky., advised him he was not able to take such training. The plaintiff testified his occupation before entering the army was farming, but since his discharge he was not able to do regular farm work because of his arm and pain in his side. He said whenever he worked as much as two or three hours at a time he coughed constantly and became so weak he had to stop and go to bed.

Plaintiff stated he still spits blood at intervals, which is usually caused by exercise or exertion. He stated that he had a cough when he came out of the Army, which he still has, and is also greatly troubled with shortness of breath. He stated he had little strength in his injured arm, and that he could only hold up an eleven-pound weight. Part of the bone was blown out, and he could not bend his arm at all, and could not even get it up to his face. He said he lived on the farm with his mother for a year and a half after his discharge from the Army, but was not able to do any farming. He said he drove a car for short distances, but not for any long periods of time. He said he was able to milk a cow and had raised a garden. He married on August 16, 1920, and has four children.

Plaintiff testified he did not apply for the benefits under this policy until 1930 because he did not know until then he could apply. He was under the impression that these policies were paid after death. He said suit was not filed sooner because it was three years before he received denial from the government. He said suit was filed a few days after the denial.

The preponderance of the evidence clearly shows the plaintiff had a diseased bronchi and pleura before he left the Army, and there is substantial evidence he was afflicted with asthma. All of these ailments are closely associated with tuberculosis, and, according to medical writers, the symptoms of some of them may indicate tuberculosis. Diseases of the Chest, Norris & Landis, p. 623. There is likewise substantial evidence that the plaintiff was afflicted with tuberculosis in a chronic stage at the time of his discharge and while the policy sued on was in full force and effect. A characteristic feature of tuberculosis is a breaking down and destruction of tissues. It may be and often is arrested, but the tissues destroyed are not recreated, nor do they grow again. Any impairment is permanent, and, if extensive, would permanently impair the power of a person so afflicted to thereafter follow a gainful occupation. If, in addition to the impairment of the chest functions of the body, a limb was destroyed, total and permanent disability might exist.

■ The Seventh Amendment to the Constitution guarantees a jury trial in law cases, where there is substantial evidence to support the claim of the plaintiff in an action. If a single witness testifies to a fact sustaining the issue between the parties, or if reasoning minds might reach different conclusions from the testimony of a single witness, one of which would sub-

stantially support the issue of the contending party, the issue must be left to the jury. Trial by jury is a fundamental guaranty of the rights of the people, and judges should not search the evidence with meticulous care to deprive litigants of jury trials.

The defendant's counsel attaches great importance to the delay by the plaintiff in instituting this action and contends this is strong evidence of the fact the plaintiff did not consider his injury and disease as total permanent disability.

■ The Supreme Court in Lumbra v. United States, 290 U.S. 551, 561, 54 S.Ct. 272, 276, 78 L.Ed. 492, did state that long delay in instituting suit after the lapse of a war risk policy was strong presumptive evidence the plaintiff did not believe he was permanently and totally disabled, and this decision has many times been cited as strong presumptive evidence of a lack of total and permanent disability. The power to fix the period of limitations in which suits may be brought on war risk insurance policies belongs to the Congress, and a vicarious application of the equitable principle of laches should not be brought into a law case unless it practically arises to the dignity of an estoppel.

The plaintiff's testimony as to the reason for the delay in bringing the suit was a question for the jury and not the court to decide.

■ Considering all the facts and inferences which may reasonably be drawn from them, I am convinced there was sufficient evidence in this case of total and permanent disability to submit it to the jury.

The defendant strongly relies on the case of United States v. Middleton (C.C.A. Sixth Circuit) 81 F.(2d) 205, in support of its contention that a peremptory instruction should have been given. In the cited case the insured had tuberculosis in its incipient stage when discharged from the Army, but there was no proof it had at that time progressed to such an extent as to be totally and permanently disabling. This case is not entitled to the weight given by counsel, unless we are to infer that the court means to decide that in no case can tuberculosis be considered as a disease causing total and permanent disability in its early and permanent stages, and in addition the plaintiff here not only had a diseased respiratory system at the time the policy was admittedly in force, but had also permanently lost the use of an arm.

The Supreme Court in Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L. Ed. 977, held as a matter of law that the loss of the right arm and 90 per cent. of sight in the right eye did not constitute total and permanent disability, but more than one partial disability existing in the same person might as to him constitute total and permanent disability. In any event, it seems to me the facts in the case at bar were sufficient for the jury to decide the question of total and permanent disability, and a peremptory instruction on the part of the court would have invaded the province of the jury. Howard v. Louisiana & A. R. Co. (C.C.A.) 49 F.(2d) 571; United States v. Hannan (C.C.A.) 85 F.(2d) 341.

■ Defendant's counsel complains of the court's instruction, because in the charge the court in some parts thereof used the words "permanently disabled" rather than "totally and permanently disabled"; and further that the charge of the court permitted the jury to find for the plaintiff if he sustained a permanent disability while in the Army, and, as the evidence showed conclusively, that the plaintiff's arm was injured while in the Army, the effect of the charge was to direct the jury to find for the plaintiff.

There is no exception to the rule that in ascertaining the correctness on point of law of the instructions of the court the whole charge and its entire scope must be taken together, and isolated words and segregated sentences are not to be separated from the context in determining the correctness of the charge. Congress & E. Spring Company v. Edgar, 99 U.S. 645, 25 L.Ed. 487. Applying this rule to the charge here in question, the jury was told that the plaintiff's policy expired on May 30, 1919, and he must have suffered a "total permanent disability before that date." The words thus used are immediately defined in the instruction, and the jury was told that "permanent disability" means "total disability," and that the whole phrase means that such disability must continue throughout the life of the person suffering from it.

The jury was further told that the policy did not cover total temporary disability or partial permanent disability, and further that periods of total temporary disability, though likely to recur at intervals, did not justify recovery under the policy; and the jury was further instructed that

694

the loss of a leg or limb, standing alone, did not support recovery under the policy.

The jury retired, and later returned to the courtroom and asked for further instructions, and at that time the following instructions were given in writing, and by consent of parties taken by the jury to its room: "Total disability exists only when any impairment of mind or body renders it impossible for the disabled person to follow continuously or with reasonable regularity any substantially gainful occupation. And total disability shall be deemed to be permanent only when it is found upon certain conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it. The policy sued on does not cover total temporary disability or partial permanent disability and does not authorize or permit any payment for physical or mental impairment that is less than 'total permanent disability'. Periods of total temporary disability, though likely to recur at intervals, does not constitute the disability covered by the policy for 'permanent' means that which is continuous as contrasted with that which is 'temporary'. And permanent disability, which is partial and not total, does not constitute the disability covered by the policy."

The charge of the court may have lacked nicety, precision, and continuity, but as a whole it could not have been misunderstood by the jury, and within it was every element of law to which the parties were entitled.

There are no errors of a substantial nature in the charge prejudicial to the rights of the defendant. The motion for a new trial will be denied.